**Wilbur F. FUHRMAN**

v.

**READING COMPANY.**

**Civ. A. No. 38273.**

United States District Court,
E. D. Pennsylvania.

April 15, 1970.

F. Ross Crumlish and Joseph P. Braig, Philadelphia, Pa., for plaintiff.

Denis V. Brenan and William J. Taylor, Philadelphia, Pa., for defendant.

## OPINION

JOHN MORGAN DAVIS, District Judge.

The defendant in this case has filed a Motion for Judgment Notwithstanding the Verdict and a Motion for a New Trial. In support of his motions the defendant alleges the following:

1. Plaintiff failed to sustain his burden of proof regarding the defendant's negligence.

2. The verdict is excessive.

3. The trial Judge made various errors in his rulings and in the general conduct of the trial.

### FACTUAL BACKGROUND.

On the evening of December 15, 1963, plaintiff, a brakeman, was one of five members of a crew working in a freight yard of the defendant company. The crew was ordered by the yardmaster to go to track No. 5 and pick up a draft of cars which was "all in" and move them to the New Jersey Central Yard. (N.T. 51–56). Track No. 5. is a track which is used to assemble cars with a similar destination. It holds about 26 to 34 cars depending upon the type of cars and the usual practice is to fill up the tracks before moving the standing train. (N.T. 46, 50, 239). Track No. 5 is higher on the west end than on the east end (N.T. 25), and, while assembling the cars, it is customary for the crew on the west end to push a car or cars for a short distance and then let the momentum and

gravity of the track move the car toward the east end (N.T. 41–45). However, the first three or four cars down the track must be ridden by a brakeman who stops the car at the east end and then applies the brakes so that the first three or four cars can then hold the remaining cars. (N.T. 45). Also, experienced railroaders would not push fully loaded cars down the track without a brakeman because the impact on the standing cars would be too great. (N.T. 45–48).

Plaintiff and the rest of the crew came in with an engine on the east end (the lower end) of track No. 5 and plaintiff got off the engine and proceeded to release the brakes on the first few box cars. (N.T. 58–61). While standing on the brake platform of the one of the box cars there was a terrific impact which moved the engine and the entire draft of cars about a half of car length and threw plaintiff onto the ground, whereupon he sustained serious injuries. (N.T. 62–69; 431).

## I.

Defendant's first contention is that the plaintiff failed to present sufficient evidence to allow a jury to conclude that defendant was negligent and that such negligence contributed to the accident. To support this contention the defendant states that the plaintiff has only shown that an accident occurred and that this is insufficient under the Federal Employers' Liability Act to impose liability on defendant. It is defendant's argument that plaintiff must present positive facts demonstrating that defendant was negligent, and that such negligence was the cause of plaintiff's injury.

 The Court disagrees with defendant's argument. Negligence can not only be defined as the doing of that which a reasonably prudent man would not do under the circumstances but also as the failing to do that which a reasonably prudent man would do under the circumstances. In this regard, negligent acts of commission are usually proved by

direct evidence, while negligent acts of omission are usually proved by circumstantial evidence. Pope v. Reading Co., 304 Pa. 326, 156 A. 106, (1931). Thus, it has been held that a plaintiff in a negligence action does not have to prove the cause of the accident by direct evidence but is only required to show circumstances from which a reasonable inference of defendant's negligence can be drawn. Lewis v. U. S. Rubber, 414 Pa. 626, 202 A.2d 20 (1964).

 It is clear that under the FELA the defendant has the duty to provide its employees with a safe place to work. Sano v. Pennsylvania R. Co. 282 F.2d 936 (C.A.Pa.1960). The Court believes that in this case there is ample evidence to indicate that the defendant railroad through one or more of its employees failed to act in a manner in which a reasonably prudent person would have acted to provide the plaintiff with a reasonably safe place to work.

The evidence presented at trial clearly shows that the yardmaster, who was in charge of the entire yard, told plaintiff's crew that the draft of cars on track No. 5. was "all in" and that it was safe to go onto that track and move the draft to the Jersey Central yard (N.T. 56, 422, 444); the yardmaster knew, or should have known, that there was another crew working on the west side of the yard and it was normally their job to assemble the drafts of cars with similar destinations; (N.T. 25,446) while plaintiff and the rest of the crew were working on the draft of cars there was a terrific impact which moved the engine and the entire draft about a half a car length (N.T. 431); throwing one crew member about in the engine (N.T. 561) and throwing the plaintiff off a boxcar onto the ground (N.T. 62).

██ Therefore based on the above evidence, the Court holds that a jury could draw a reasonable inference that the defendant was negligent and that such negligence was the proximate cause of plaintiff's injuries. As was stated in Rogers v. Missouri Pacific R. Co. 352

U.S. 500, 507, 77 S.Ct. 443, 448, 1 L.Ed. 2d 493 (1957), the test of a jury case "is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury * * * for which damages are sought."

## II.

Defendant's second contention is that the verdict in the amount of $109,928.40 is excessive. In reviewing this issue, it must be borne in mind that the Court should not arbitrarily substitute its judgment for that of the jury if there is ample evidence to justify the award.

Plaintiff's evidence showed that his loss of earnings from the date of his accident to the date of trial was approximately $16,388.00 (N.T. 688, 832–833, 1023), and that he incurred medical bills in the sum of $1,941.00. He presented two expert medical witnesses, Doctor Corn and Doctor Gelfand.

The testimony of Doctor Corn (N.T. 459–498), a specialist in orthopedic surgery, may be summarized as follows: He examined the plaintiff for the first time on June 17, 1965 and obtained the following history from him and from the Sacred Heart Hospital, Allentown, Pennsylvania. He was employed as a railroad brakeman, that he fell from the top of a box car to the ground on December 15, 1963, and sustained injuries including a fracture of the right clavicle, fracture of the sternum and multiple fractures of the right rib cage. He was admitted to the Sacred Heart Hospital, and according to the records of that hospital, he appeared "shocky", was in considerable pain and had some respiratory distress. He received sedation and analgesics, and his right upper limb was immobilized with a sling. He was hospitalized for 39 days, and toward the end of his stay, he started on physical therapy treatments with exercise and massage. Plaintiff told Doctor Corn that ever since the injury he had experienced pain in the shoulder and arm, and that pain was felt with the use of the right arm especially when he is required to elevate it, and that he has severe pain at night, and takes aspirin for this pain, but received no other medical treatment.

Doctor Corn gave the plaintiff a physical examination and had x-rays taken of plaintiff's right shoulder, shoulder girdle and rib cage. After examining the x-rays, Doctor Corn concluded that plaintiff had post-traumatic tendonitis (Inflammation of the tendons) of the right shoulder (N.T. 465–469).

On October 4, 1968, Doctor Corn saw plaintiff for the second time. At this appointment plaintiff complained of limited motion in the right shoulder, that he had a heart attack in October of 1966 and a second one in January of 1967, that he complained of increasing pain and stiffness of the right shoulder since September of 1966. (N.T. 472).

A physical examination of the right shoulder and arm revealed the following limitations on the motion of the right arm: an eighty degree flexion, a 50% glenohumeral motion, and a thirty to forty degree external rotation. He could move his right hand behind his back only as far as his waist line instead of the shoulder blade level (N.T. 472–474). The doctor felt that "with the heart attacks and the forced rest, he (plaintiff) apparently has aggravated this condition to some degree and that now he has a rather severe adhesive capsulitis (restriction of motion) of the right shoulder." (N.T. 474).

It was Doctor Corn's opinion, that the orthopedic injuries of plaintiff were caused by the accident of 1963 and that the residual limitation of motion of his right arm was permanent, and that he would need medical care in the future. (N.T. 485–486).

The testimony of Doctor David Gelfand (N.T. 505–547), a specialist in the diagnosis and treatment of the heart and blood vessels, may be summarized as follows: He first saw plaintiff on February 3, 1968 at which time plaintiff complained of chest pains below the

breast bone, shortness of breath on slight exertion and weakness and fatigue. Plaintiff had been admitted to the Coaldale State Hospital on September 18, 1966, where the diagnosis was a heart attack. He was readmitted to that same hospital on January 23, 1967. Doctor Gelfand gave plaintiff a physical examination, a fluoroscopic examination and an electrocardiogram. As a result of that examination his diagnosis was arteriosclerotic heart disease, coronary sclerosis with occlusion and anginal syndrome.

At a second visit on March 20, 1968, plaintiff complained of marked shortness of breath, of substernal pressure on slight exertion, pain in the right shoulder and of inability to raise his right arm. He was quite nervous and used Anacin and Aspirin constantly. He was given a physical examination similar to that of the first visit (N.T. 518–519).

The last time he saw plaintiff was on October 4, 1968, at which time he conducted the same type of physical examination as before (N.T. 519–520).

Doctor Gelfand gave his opinion as follows: "It is my opinion that the accident of December 15, 1963, has aggravated the physical condition of Mr. Fuhrman and precipitated the symptomatic phase of coronary artery disease manifested by the appearance of anginal syndrome. The coronary artery disease was progressive in nature and culminated in an acute myocardial infarction on September 18, 1966 (N.T. 515)." And again upon further questioning Doctor Gelfand stated:

"It is my opinion that the accident of December 15, 1963 did injure—did certainly cause the fractures which I described—and in addition gave rise to a bruise on heart muscle, a cardiac contusion as the result of the fracture, of the depressed fracture, of the breast bone.

"You must know that the heart lies immediately below, behind the breast bone, and in order to have—this must have been a tremendous force to cause a fracture in this particular area.

You must remember that this is a very flat thick bone, and that this fracture was indeed depressed, and that this caused a bruise to the heart muscle which gave rise to his angina pectoris, and once this occurs, this injury to the heart muscle, you have a relentless progression of events which indeed culminate in his heart attack in September 1966, and therefore it is my opinion that the accident which he sustained in December 1963 is the cause of his present physical disability, not only from the fractures but also with regard to the heart itself." (N.T. 528–529).

After introducing the above medical evidence, the plaintiff presented the testimony of Mr. Goodfarb, a consulting actuary, who testified to the loss of earning capacity. His testimony concerned the present value of plaintiff's loss of earning capacity based on work, life expectancy to age 65 and 70 and using discounted interest rates of both 4% and 6%. His testimony was that to age 65, the present worth based on 4% and 6% is $60,779. and $53,300 respectively, and to age 70 is $91,902 and $76,000.

In deciding whether the verdict is excessive, this Court must now view the evidence in the light most favorable to the plaintiff since the jury found for him. Moreover, it is well established law that a verdict may not be set aside on the ground that it is excessive unless it is so high as to shock the conscience of the court or was the product of the jury's passion or prejudice. Forsman v. Pennsylvania Railroad Co. 180 F.Supp. 882 (D.C.Pa.1960), affd. 3 Cir., 280 F.2d 315. In this case since the plaintiff's evidence, if believed, is sufficient to justify the award, we cannot conclude that the jury acted capriciously or unreasonably and therefore this Court will not tamper with the award.

### III.

Defendant's final contention is that "The learned Trial Judge erred in his rulings and in the general conduct of the trial".

The Court has carefully considered defendant's allegations of error and finds them to be without merit. During the course of a two week trial it is not unusual for both parties to feel that they were, at times, incorrectly overruled. It must be remembered that an American trial is distinctly an adversary proceeding in which counsel are striving to foster and protect the interests of their clients. Thus, the nature of our advocacy system is such that it would indeed be a rare trial in which counsel neither asked a question thought to be objectionable nor made only wholly impartial statements.

■ It is the function of the trial judge to not only rule upon objections and other specifics during the course of a trial but also to conduct the overall trial in an orderly, impartial manner in order to elicit the truth and to attain justice between the parties. The Court is convinced that a careful reading of the entire record shows that there was no substantial error by the Court in the conduct of the trial, the rulings or the charge. Accordingly, defendant's motion for judgment notwithstanding the verdict and motion for new trial must be denied.